**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re MONA LISA AT CELEBRATION, LLC

Debtor,

---

| | |
|---|---|
| Westchester Fire Insurance Company | Case No: 6:12-cv-1339-Orl-37 |
| | Consolidated with: |
| Appellant/Cross-Appellee | Case No. 6:12-cv-1351-Orl-37 |
| | Case No. 6:12-cv-1352-Orl-37 |
| v. | Case No. 6:12-cv-1353-Orl-37 |
| Laura Bruno, *et al.*, | |
| Appellee/Cross-Appellants | |

---

Appeal from the Final Judgment Against Defendants Mona Lisa at Celebration, LLC and Westchester Fire Insurance Company, entered on July 17, 2012, in Bankruptcy Court Action No. 6:09-00458-KSJ in the United States Bankruptcy Court for the Middle District of Florida

---

# BRIEF OF APPELLANT WESTCHESTER FIRE INSURANCE COMPANY

---

Raquel M. Fernandez (FBN 0055069)
rfernandez@cozen.com
Cozen O'Connor
Southeast Financial Center, Suite 4410
200 South Biscayne Boulevard
Miami, Florida 33131-4332
Telephone: (305) 704-5940
Facsimile: (305) 704-5955

and

Robert McL. Boote
rboote@cozen.com
Cozen O'Connor
200 Four Falls Corporate Center, Suite 400
West Conshohocken, PA 19428
Telephone: (215) 665-4630
Facsimile: (610) 941-0711

*Counsel for Appellant Westchester Fire Insurance Company*

## CORPORATE DISCLOSURE STATEMENT

Appellant, Westchester Fire Insurance Company, is a Pennsylvania company, and a wholly-owned subsidiary of ACE Limited, a publicly traded company, domiciled in Switzerland.

# TABLE OF CONTENTS

**Page**

STATEMENT OF APPELLATE JURISDICTION ........................................................ 1

STATEMENT OF THE ISSUES AND THE APPLICABLE STANDARD OF APPELLATE REVIEW ........................................................ 1

INTRODUCTION ........................................................ 1

STATEMENT OF FACTS ........................................................ 4

A. The Florida Condominium Act ........................................................ 5

1. A Developer may withdraw the escrowed funds in the First 10% Account by providing Alternative Assurance approved by the Division, to be held by the Escrow Agent to substitute for the withdrawn funds. ........................................................ 5

2. Subsections (2) and (3) of § 718.202 provide that the funds in the Over 10% "Special Account" may be released to the Developer if the Purchase Contract so provides and the Statute makes no provision for Alternative Assurance. ............ 6

B. The Escrow Agreement parallels the provisions of Subsections 718.202(1), (2), and (3). ........................................................ 7

C. The provisions of the Bond do not conflict and the Bond, giving effect to all its provisions, limits the Surety's liability to the First 10% Deposits. ................................ 11

1. The first paragraph of the Bond (1) states the financial guarantee (2) states the parties, and (3) defines the subject matter of the Bond. ................................... 11

2. The numbered paragraphs of the Bond track the provisions of Subsection (1) of Section 718.202 that govern the First 10% Deposits. ................................... 12

D. The operation of the Surety Bond with its incorporated provisions. ............................... 14

E. The Purchase Agreements properly informed Appellees how their deposits would be used as required by Section 718.202. ........................................................ 15

F. Plaintiffs' claims against Mona Lisa and Westchester ................................................... 17

SUMMARY OF ARGUMENT ........................................................ 18

ARGUMENT ........................................................ 19

A. The governing principles of contract interpretation under Florida law. .......................... 19

B. The Bankruptcy Court's own factual findings that the intent of the parties to the Bond was that it was to permit the release of the First 10% Deposits by substituting Westchester's contractual obligation to the Escrow Agent for the released funds contradict the Court's holding that the Bond is liable for the refund of the Over 10% Deposits ........................................................ 22

C. The Bond and the writings it incorporated limit the Surety's liability to the First 10% Deposits only. ........................................................ 22

1. The Bond's first paragraph defines the Surety's obligation and the Bond has no meaning without that paragraph. ..... 23

2. The Bankruptcy Court failed to give effect to the remainder of the language of paragraph 4 of the Bond. ..... 24

3. Paragraph 5 of the Bond specifically limits the Surety's obligation to the obligation set forth in the Escrow Agreement. ..... 26

D. Construction of the Bond's guarantee of Alternative Assurance as limited to the First 10% Deposits accords with the intent of the parties to the Escrow Agreement, the Legislative intent as set forth in the Act, and Appellees' Agreement to the scope of the Bond's guarantee. ..... 27

CONCLUSION ..... 28

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*American Home Assur. Co. v. Larkin Gen'l Hosp., Ltd.*,
593 So.2d 195 (Fla. 1992)....................19, 20

*Citizens Ins. Co. v. Barnes*,
124 So. 722 (Fla. 1929)....................21

*City of Tampa v. Ezell*,
902 So.2d 912 (Fla. 2d DCA 2005)....................20

*Crabtree v. Aetna Cas. & Sur. Co.*,
438 So.2d 102 (Fla. 1st DCA 1983)....................27

*Double AA Int'l Inv. Group, Inc. v. Swire Pacific Holdings, Inc.*,
No. 08-2344, 2010 WL 1258086 (S.D. Fla. March 30, 2010)....................5, 28

*Fla. Power Corp. v. City of Tallahassee*,
18 So.2d 671 (Fla. 1944)....................20

*Grant v. State Farm Fire and Cas. Co.*,
638 So.2d 936 (Fla. 1994)....................21

*In re Colortex Indus., Inc.*,
19 F.3d 1371 (11th Cir. 1994)....................1

*In re Laketown Wharf Marketing Corp.*,
433 B.R. 401 (Bankr. N.D. Fla. 2010)....................26

*In re Mona Lisa at Celebration, LLC*,
410 B.R. 710 (Aug. 12, 2009)....................4, 15

*In re Mona Lisa at Celebration, LLC*,
472 B.R. 582 (Bankr. M.D. Fla. May 16, 2012) ("Decision")....................passim

*In re Weeks Landing, LLC v. RCMP Enterprises, LLC*,
439 B.R. 897 (Bankr. M.D. Fla. 2010)....................1

*Johnson v. Johnson*,
725 So.2d 1209 (Fla. 3d DCA 1999)....................24

*Northbrook Property & Cas. Ins. Co. v. R&J Crane Service, Inc.*,
765 So.2d 836 (Fla. 4th DCA 2000)....................21

*OBS Co. v. Pace Constr. Co.*,
558 So.2d 404 (Fla. 1990)....................21

*Westchester Fire Ins. Co. v. City of Brooksville*,
731 F. Supp. 2d 1298 (M.D. Fla. 2010)....................27

*P.C. Lissenden Co. v. Bd. of County Comm'rs of Palm Beach*,
116 So.2d 632 (Fla. 1960)....................21

*Quix Snaxx, Inc. v. Sorensen*,
710 So.2d 152 (Fla. 3d DCA 1998)....................21

*Westside EKG Assocs. v. Foundation Health*,
932 So.2d 214 (Fla. 4th DCA 2005)....................21

**STATUTES**

28 U.S.C. § 157....................1

28 U.S.C. § 158(a)....................1

Fla. Stat. 718.101 *et seq.*....................2

Fla. Stat. 718.202.................... passim

## STATEMENT OF APPELLATE JURISDICTION

The United States District Court functions as an appellate court in reviewing decisions of the United States Bankruptcy Court. *In re Colortex Indus., Inc.*, 19 F.3d 1371, 1374 (11th Cir. 1994); *In re Weeks Landing, LLC v. RCMP Enterprises, LLC*, 439 B.R. 897, 901 (Bankr. M.D. Fla. 2010). This Court has jurisdiction over this appeal under 28 U.S.C. § 158(a) since, as the Bankruptcy Court below held, this is a core matter under 28 U.S.C. § 157.

## STATEMENT OF THE ISSUES AND THE APPLICABLE STANDARD OF APPELLATE REVIEW

The issue to be reviewed in this appeal is whether the Bankruptcy Court erred when it determined that the Bond executed by Appellant Westchester Fire Insurance Company ("Westchester"), as surety for Mona Lisa Development, LLC ("Mona Lisa"), as "alternative assurance," pursuant to subsection (1) of Fla. Stat. Section 718.202(1), that provided funding for the escrow agent's return of Appellees' deposits for their condominium purchases up to the first ten percent of the units' sale prices, *also* provided the same financial guarantee for the return of deposits in excess of the ten percent, pursuant to subsections (2) and (3) of Fla. Stat. 718.202, which funds had been held in a statutory "special account" and had been released to Mona Lisa for construction in accordance with those subsections.

Since the matters below were core matters under 28 U.S.C. § 157, this Court reviews the findings of fact of the Bankruptcy Court under a clearly erroneous standard; reviews conclusions of law on a plenary basis; and reviews matters entrusted to the discretion of the Bankruptcy Court on an abuse of discretion standard. *In re Colortex Indus., Inc.,* 19 F.3d at 1374.

## INTRODUCTION

Mona Lisa owned and operated the upscale Mona Lisa Suite Hotel in Celebration, Florida. Mona Lisa completed construction of the project in 2008. At the height of Central

Florida's real estate boom, Appellees contracted (under "Purchase Contracts") to buy Mona Lisa hotel-condominium units. The Purchase Contracts required the Appellees to make a minimum deposit of ten percent of the purchase price ("First 10% Deposits"). Appellees also made deposits in excess of ten percent of the purchase price ("Over 10% Deposits").

Pursuant to the Florida Condominium Act ("Act"), Fla. Stat. 718.101 *et seq*., requirements, Mona Lisa established two separate escrow accounts, under an Escrow Agreement, with SunTrust Bank ("SunTrust" or the "Escrow Agent") to hold Appellees' deposits. The first account was to hold Appellees' deposits up to 10% of each unit's purchase price ("First 10% Account") as required by subsection (1) of Fla. Stat. § 718.202. The second account, established pursuant to subsections (2) and (3) of Fla. Stat. § 718.202 was to hold deposits over 10% of the unit's purchase price ("Over 10% Account"). To partly fund the construction of this $50 million development, Mona Lisa desired to withdraw the funds held in the First 10% Account. To allow the escrowed funds to be withdrawn, the Act required Mona Lisa to provide a financial guarantee to the Escrow Agent to substitute for the withdrawn funds. The Act calls such a financial guarantee "alternative assurance." Fla. Stat. § 718.202(1). To provide this alternative assurance, Mona Lisa obtained a surety bond (the "Surety Bond" or "Bond") from Westchester in the amount of $5 million, later increased to $6.575 million, in favor of SunTrust, the Escrow Agent. Mona Lisa, as principal, and Westchester, as its surety, were the Bond's two obligors.

When the real estate market softened, Appellees declined to honor their Purchase Contracts, refused to close, and defaulted on the Purchase Contracts. As a result of Appellees' failure to honor their Purchase Contracts, among other things, Mona Lisa filed for bankruptcy protection on January 15, 2009. Appellees filed four adversary proceedings against Mona Lisa, its Surety, Westchester, and Mona Lisa's Escrow Agent, Sun Trust.[1] As relevant to this appeal,

---

[1] Counts I-IV alleged that Mona Lisa violated the Interstate Land Sales Full Disclosure Act; Count V alleged that Mona Lisa failed to file a registration statement in violation of the

the Appellees asserted that Westchester was liable to fund not only the Escrow Agent's return of the First 10% Deposits, referred to in the Bond, and in Subsection 718.202(1), but also the Over 10% Deposits that the Escrow Agent had released from the Over 10% Account pursuant to Subsections 718.202(2) and (3).

On cross-motions for summary judgment on Appellees' sixteen count complaints, the Bankruptcy Court entered a judgment in favor of the Appellees holding that Appellees were entitled to the return of their entire deposits from Mona Lisa. The Court held (and, given the court's ruling, Westchester does not dispute) that, in view of Mona Lisa's inability to refund the deposits, the Bond funded the Escrow Agent's return of the First 10% Deposits.[2] *In re Mona Lisa at Celebration, LLC*, 472 B.R. 582, 646 (Bankr. M.D. Fla. May 16, 2012) ("Decision"). In addition, however, the Bankruptcy Court held that Westchester was also liable *directly to the Appellees* for the return of the Appellees' Over 10% Deposits up to the limit of the Bond. *Id.*

---

Securities Act of 1933; Count VI alleged that Mona Lisa failed to file a registration statement in violation of the Investor Protection Act in Florida Chapter 517; Count VII alleged that Mona Lisa failed to maintain separate escrow accounting for purchaser deposits and used purchaser deposits for improper purposes in violation of Section 718.202 of the Act; Count VIII alleged Mona Lisa failed to file with the Division all the required documents and amendments in violation of Section 718.502 of the Act; Count IX alleged that Mona Lisa failed to deliver a prospectus and disclosure statement with all exhibits to purchasers in violation of Section 718.503 of the Act; Count X claimed Mona Lisa made material misrepresentations in advertising material; Count XI alleged the conduct described in Counts I-X violated the Florida Deceptive and Unfair Trade Practices Act; Count XII alleged Mona Lisa failed to comply with Fla. Stat. § 190.048; Count XIII alleged Mona Lisa failed to notify purchasers of the types of insulation used in their units; Count XIV alleged Mona Lisa failed to disclose that units were subject to a homeowner's association; Count XV alleged Mona Lisa breached the Purchase Agreement; and Count XVI sough declaratory relief.

[2] The Bankruptcy Court's decision was entered as *Order on Cross Motions for Summary Judgment* (Case No. 6-12-cv-1339, D.E. 10-3*)* on May 16, 2012. Thereafter, on or about July 17, 2012, the Bankruptcy Court entered final judgment against the Defendants as *Final Judgment Against Defendants Mona Lisa at Celebration, LLC and Westchester Fire Insurance Company (*Case No. 6-12-cv-1339, D.E. 1-2*)*. This Appeal was timely filed as it was filed on July 26, 2012, the ninth day after the entry of final judgment.

In this latter holding, the Bankruptcy Court erred by basing its decision solely on the first 5 lines of paragraph 4 of the Bond, failing to give meaning to all of the Bond's terms, and failing to interpret the Bond, together with the expressly incorporated provisions of the Act (Subsections (1), (2), and (3) of Section 718.202) and the expressly incorporated Escrow Agreement. Further, the Bankruptcy Court failed to apply its repeated finding that the *intent of the sole parties to the Bond*, only Mona Lisa, the Escrow Agent, and the Division, was to provide substitute funding that could be drawn by the Escrow Agent for the funds released to Mona Lisa from the First 10% Account. *In re Mona Lisa*, 472 B.R. at 620-621.

Thus, the Bankruptcy Court's Decision, as a matter of fact and law, was in error. The Bond provides funding for the Escrow Agent's return only of Appellees' First 10% Deposits pursuant to Subsection 718.202(1), and did not provide funding for the Escrow Agent's return of Appellees' Over 10% Deposits held and released pursuant to Subsections 718.202(2) and (3). Accordingly, Westchester requests this Court to reverse the Bankruptcy Court's holding on this issue.

## STATEMENT OF FACTS

Mona Lisa is a limited liability company formed to develop, hold and sell one and two bedroom hotel-condominium suites at the upscale Mona Lisa Suite Hotel ("Hotel") in Celebration, Florida. *See In re Mona Lisa at Celebration, LLC*, 410 B.R. 710, 713 (Aug. 12, 2009); Declaration of William Haberman in Support of Defendant's Motion for Summary Judgment ("Haberman Dec.")(Case No. 6-cv-1339, D.E. 19) at ¶¶ 16, 17.[3] The development consists of three buildings, an amenities building and two condominium unit buildings arranged

[3] Westchester has contemporaneously filed an Appendix which includes for the Court's convenience copies of the Decision, Section 718.202, the Bond, the Escrow Agreement, and the Purchase Agreement. References to all other exhibits herein are to the exhibits filed in support of and in opposition to the motions for summary judgment filed below.

in a semi-circular arc, around a circular pool, surrounded by landscaping, decking, and a restaurant and bar. *In re Mona Lisa at Celebration, LLC*, 472 B.R. 582, 594 (Bankr. M.D. Fla. May 16, 2012); App. Ex. A. The two buildings on either side of the amenities building contain 240 one and two bedroom suites. *Id.* Mona Lisa completed construction of the development in early 2008, obtained a certificate of occupancy on May 7, 2008, and began to close on sales of units soon thereafter. *Id.*

**A. The Florida Condominium Act**

The Florida Condominium Act comprehensively regulates the development and sales of Florida condominiums. *Double AA Int'l Inv. Group, Inc. v. Swire Pacific Holdings, Inc.*, No. 08-2344, 2010 WL 1258086, *6 (S.D. Fla. March 30, 2010), *vacated in part on other grounds,* 637 F.3d 1169 (11th Cir. 2011) . The Florida Department of Business and Professional Regulation, Division of Florida Land Sales, Condos and Mobile Homes (the "Division") regulates and enforces the Act. *Id.*

Section 718.202 of the Act governs how a developer must handle buyer deposits. *See* Appendix, Exhibit B. In particular, Subsections 718.202(1) and (2) require that for an uncompleted development the developer must place all deposits in escrow accounts and, where a deposit exceeds 10% of the purchase price, the developer must segregate each deposit into two separate accounts – that we have called earlier the First 10% Account and the Over 10% Account.

**1. A Developer may withdraw the escrowed funds in the First 10% Account by providing Alternative Assurance approved by the Division, to be held by the Escrow Agent to substitute for the withdrawn funds.**

A developer may not withdraw the escrowed funds on deposit in the First 10% Account until closing unless it provides a financial guarantee, "alternative assurance," in the form of a surety bond or a letter of credit. The governing subsection provides:

> § 718.202. Sales or reservation deposits prior to closing.
>
> (1) . . . the developer shall pay into an escrow account all payments up to 10 percent of the sale price received by the developer from the buyer towards the sale price. The escrow agent shall give to the purchaser a receipt for the deposit, upon request. *In lieu of the foregoing, the division director has the discretion to accept other assurances, including, but not limited to, a surety bond or an irrevocable letter of credit in an amount equal to the escrow requirements of this section. . .*

Fla. Stat. § 718.202(1)(emphasis supplied). Thus, subsection (1) provides that a developer must place all buyer deposits up to the first ten percent of a condominium's purchase price into an escrow account held by an independent escrow agent. *Id.* However, subsection (1) provides a mechanism for the developer to withdraw from escrow the funds deposited to the First 10% Account, by providing to the Escrow Agent with a Division-approved substitute, i.e., "alternative assurance." Upon Division approval of this substitute for the escrowed funds in the First 10% Account, the Escrow Agent may release the funds to the developer.

**2. Subsections (2) and (3) of § 718.202 provide that the funds in the Over 10% "Special Account" may be released to the Developer if the Purchase Contract so provides and the Statute makes no provision for Alternative Assurance.**

For buyers' deposits over 10% of a unit's purchase price, subsections (2) and (3) [and not subsection (1)] of Fla. Stat. 718.202 govern. First, the developer must create a second escrow account referred to as the "special escrow account." Fla. Stat. § 718.202(2). The funds deposited into the special escrow account may be released to the developer upon the start of construction, but the statute prohibits the developer from using the funds released for "salaries, commissions, expenses of salespersons or for advertising expenses." Fla. Stat. 718.202(3). Subsections (2) and (3) state these requirements as follows:

> (2) *All payments which are in excess of the 10 percent of the sale price* described in subsection (1) and which have been received prior to completion of construction by the developer from the buyer on a contract for the purchase of a condominium parcel *shall be held in a special escrow account* established as provided in subsection (1) and controlled by an escrow agent *and may not be used by a developer prior to closing the transaction, except as provided in subsection (3)* or except for refund to the buyer. . .
>
> (3) *If the contract for the sale of the condominium unit so provides, the developer may withdraw escrow funds in excess of 10 percent of the purchase price* from the special account required by subsection (2) *when the construction of improvements has begun.* He or she may use the funds in the actual construction and development of the condominium property in which the unit to be sold is located. However, *no part of these funds may be used for salaries, commissions, or expenses of salespersons or for advertising purposes.* A contract which permits use of the advance payments for these purposes shall include the following legend conspicuously printed or stamped in boldfaced type on the first page of the contract and immediately above the place for the signature of the buyer: ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.

Fla. Stat. § 718.202(2) and (3) (emphasis supplied). Thus, unlike the Under 10% Deposits, the Over 10% Deposits may be released from escrow to the developer, after construction has begun, if the Purchase Contract provides for such a release and the buyer is so advised. Upon release of the Over 10% Deposits, the Escrow Agent has no further contractual or statutory responsibility for them. There is no provision, much less a requirement, whatever for alternative assurance for the Over 10% Deposits.

### B. The Escrow Agreement parallels the provisions of Subsections 718.202(1), (2), and (3).

In compliance with Section 718.202, Mona Lisa entered into an Escrow Agreement with SunTrust Bank as of December 1, 2006. *See* App. Ex. C. Following the statutory structure, the

Escrow Agreement provides, in section 4, that the First 10% Deposits will be treated in accordance with subsection (1) of Section 718.202. In Paragraph 5.4, the Agreement provides that the Over 10% Deposits will be treated in accordance with subsections (2) and (3) of Section 718.202.

With respect to the First 10% Deposits, the Escrow Agreement states that Mona Lisa, as developer, reserves the right to provide "alternative assurance" and restates the statutory requirements for the release from escrow of the First 10% Deposits. Specifically, for the First 10% Account, the Escrow Agreement provides, in pertinent part, as follows:

> 2. **<u>Deposit of Funds</u>.** From time to time, Developer will deliver cash or checks payable or endorsed to Escrow Agent, which cash or checks will represent one hundred percent (100%) of the Deposits paid by certain Buyers pursuant to certain Contracts. . .
>
> 4. **<u>Alternative Assurance</u>.** Developer [Mona Lisa] reserves the right to post an alternative assurance in accordance with Section 718.202, *Florida Statutes*, and Chapter 61B-17.009, *Florida Administrative Code*. The director of the Division [of Florida Land Sales, Condominiums, and Mobile Homes of the Department of Business and Professional Regulation] has the discretion to accept other assurances ("Alternative Assurance") from Developer in lieu of the escrow of all or any portion of the funds required to be escrowed hereunder (*e.g. all of a Buyer's deposit up to ten percent (10%) of the purchase price*). Developer may, but is not obligated to, submit to the Division for approval a letter of credit … or other Alternative Assurance, such as surety bonds ("Surety Bonds") or cash, as may be approved by the Division from time to time. If the Division accepts the Alternative Assurance as being sufficient under the Condominium Act and this Agreement, such Alternative Assurance will serve as security for all or a portion of the Deposits otherwise required to be escrowed hereunder in accordance with the terms and conditions of this Agreement. … Upon the issuance of any such … Surety Bond, and upon receipt of a letter from the Division approving same, Escrow Agent shall disburse to Developer all Deposits held or hereafter paid to Escrow Agent up to but not more than the principal amount of the … Surety Bond delivered to Escrow Agent.

*See* App. Ex C, Escrow Agreement at ¶ 4 (emphasis supplied). In short, the Escrow Agreement contemplates that the developer, Mona Lisa, will turn over all deposits from buyers of Mona Lisa units to the Escrow Agent, and the Escrow Agent will create two separate escrow accounts – one for deposits up to ten percent of the purchase price, and another for funds in excess of ten percent of the deposits. For the First 10% Account, the Escrow Agreement provides that the Escrow Agent may, upon the developer providing to the Escrow Agent alternative assurance approved by the Division, release the funds deposited into the First 10% Account up to the amount of the alternative assurance.

For the Over 10% Account, the Escrow Agreement follows the provisions of Subsections 718.202(2) and (3). Paragraph 4.4 of the Escrow Agreement provides how the funds held in the "Over 10% Account" may be released to the Developer:

> 4.4 **Release of Funds to Developer**. Funds retained by Developer pursuant to this Section 4 because they are secured by the Alternative Assurance may only be released from the Alternative Assurance upon presentation to the Escrow Agent of one of the certifications set forth in Section 5.1, Section 5.2 or Section 5.3, [pertaining to Buyer cancellation, buyer default, and disbursement at closing, respectively] . . .

App. Ex C, Escrow Agreement at ¶4.4.

Consistent with the separate treatment in the Condominium Act for funds in the "Over 10% Account," Paragraph 5.4 of the Escrow Agreement permits the Escrow Agent to release funds held in the "Over 10% Account" without any alternative assurance. This provision expressly states that the developer need only submit a written statement that construction has begun. Specifically, Paragraph 5.4 states:

> 5.4. **Deposits in Excess of Ten Percent**. The portion of any Deposit in excess of ten percent (10%) of the sales price of a Unit shall be held by Escrow Agent in a special escrow account. If the Contract of any Buyer so provides, upon written request to Escrow gent by Developer, accompanied by a statement that the construction of improvements has begun, Escrow Agent shall pay out of the special escrow account to Developer any Deposits in excess of ten percent (10%) of the sales price set forth in any Contract. Pursuant to Florida Statutes, Section 718.202, *such funds may not be used by Developer prior to closing the Contract except for refund to the Buyer, or except for actual construction and development of the Condominium property in which the Unit to be sold pursuant to the Contract is located. In any event, no part of such funds may be used for salaries, commissions or expenses of salesman or for advertising purposes by Developer.*

App. Ex. C, Escrow Agreement at ¶ 5.4 (emphasis supplied).

Just like subsections (2) and (3) of Section 718.202, Paragraph 5.4 of the Escrow Agreement imposes no responsibility on the Escrow Agent for the application of the released funds and indemnifies the Escrow Agent against any claim of such responsibility. Paragraph 5.4 states:

> [w]ith respect to such funds, Escrow Agent will not be responsible as to the proper application of same by Developer, and Developer agrees to indemnify and hold Escrow Agent harmless from any kind and all liabilities which may be incurred by Escrow Agent, including attorneys' fees, in connection with the disbursement of such funds to Developer.

*Id.*

Finally, the Escrow Agreement provides that: (1) it is expressly incorporated by reference in all Contracts between Developer and Buyer; and (2) the Escrow Agent shall only take direction from the Developer, and shall not take any direction from any buyer(s). *See* Escrow Agreement at ¶¶ 12, and 13.1.2.

These provisions comply with the requirements of the Act and confirm the Bond is a substitute only for the released First 10% Deposits and has nothing to do with Over 10% Deposits. Moreover, the Escrow Agreement confirms that, once released, the application of the

Over 10% Deposits becomes the developer's responsibility. The Escrow Agent has no further liability for or involvement with, those released funds.

### C. The provisions of the Bond do not conflict and the Bond, giving effect to all its provisions, limits the Surety's liability to the First 10% Deposits.

As contemplated by the Act, Mona Lisa sought the release of Appellees' First 10% Deposits from escrow. Mona Lisa submitted to the Division for approval Westchester Fire Insurance Company Bond No. K07558922, executed as surety for Mona Lisa with a limit of $5 million (later increased by rider to $6.575 million). *See* Second Amended Complaint ("SAC") ¶¶ 65, 66 (Case No. 6-cv-1339, D.E. 3); Haberman Dec. ¶ 14 and Ex. 3; Appendix Exhibit D. On December 1, 2006, the Division approved the Bond as alternative assurance to be held by SunTrust to substitute for the First 10% Deposits that Mona Lisa wanted to withdraw from escrow. *Id.*

#### 1. The first paragraph of the Bond (1) states the financial guarantee (2) states the parties, and (3) defines the subject matter of the Bond.

Four unnumbered and nine numbered paragraphs comprise the two page Bond. The unnumbered paragraphs are first. Because they come first and are unnumbered, in common lawyer parlance, they are the "recitals." But the recitals represent part of the contract and their words, rather than where they appear in a contract, establishes their significance.

The first unnumbered paragraph states what this Bond is. It states the contractual obligation, defines the parties, states the parties' agreement of the dollar limit of the obligation and states the contract's purpose. It provides:

> KNOW ALL PERSONS by these presents that the PRINCIPAL and the SURETY are held and firmly bound unto the Division of Florida Land Sales, Condominiums and Mobile Homes of the Department of Business and Professional Regulation, State of Florida (hereinafter "DIVISION") and/or unto SunTrust Bank (hereinafter "ESCROW AGENT") as obligees in the amount of Five Million Dollars and No/100 Dollars ($5,000,000.00), lawful money of the United States of America (said amount being a

> portion of the estimated total sum of the initial ten percent (10%) of deposits paid by purchasers to Developer pursuant to Purchase Agreements for the purchase of condominium units in Mona Lisa at Celebration, a Condominium in the State of Florida) for which payment will be made, the PRINCIPAL and the SURETY bind themselves, their heirs, executors, and administrators, successors and assigns, and each of them jointly and severally, firmly by these presents.

App. Ex. D, Bond, ¶ 1.

This first paragraph states the fundamental elements of a bond. Without it the document would be meaningless. This critical provision states that the Bond is a binding obligation of identified parties, Mona Lisa and its Surety, Westchester, to the two specific obligees, the Escrow Agent and the Division. It states a dollar obligation of a specific amount and the subject of that obligation, which is that the stated amount represents a portion of the First 10% Deposits paid for the purchase of Moan Lisa condominium units.

The remaining unnumbered paragraphs further define the subject matter of the Bond stating the obligations of the Division and developer under the Act, mirroring the Act's provisions.

**2. The numbered paragraphs of the Bond track the provisions of Subsection (1) of Section 718.202 that govern the First 10% Deposits.**

Like the unnumbered paragraphs, the Bond's nine numbered paragraphs also track the provisions of subsection (1) of 718.202. Paragraphs 1 through 3 provide that the Bond incorporates by reference the provisions of the Act, the Purchase Contract, and the Escrow Agreement including all their defined terms; and that the Bond may only be canceled in accordance with the provisions of the Escrow Agreement, and upon approval of the Division.

Paragraphs 4 through 9 of the Bond state the specific obligations of the Surety. The first five lines of paragraph 4 were the sole basis relied upon by the Bankruptcy Court for its holding rendering the Bond liable directly to Appellees' for all of their deposits, rather than just the First

10% Deposits. *In re Mona Lisa*, 472 B.R. at 628. However, as will be seen, there is more to Paragraph 4 than those five lines. Paragraph 4 of the Bond, in its entirety, states:

> 4. When PRINCIPAL fails to refund deposits as required by Chapter 718, Florida Statutes, and/or agreements with buyers, ESCROW AGENT or the DIVISION may declare this Bond in default and SURETY is required to disburse funds in the amount of refund deposits that are due and payable, within 30 days by SURETY, as a debt to ESCROW AGENT or DIVISION, the amount being payable subject to any reductions in the face amount calculated pursuant to Paragraph 5 herein.

The words following the first five lines provide that the Surety is to pay the funds due "as a debt owed to the Escrow Agent or Division. . ." Such a debt can only arise from the Escrow Agreement, i.e., an obligation owed by Mona Lisa (and Westchester its surety) to the Bond's sole obligee, the Escrow Agent (or the Division in its stead). Then, after characterizing the Surety's payment as a debt, Paragraph 4 continues on stating that the amount payable is subject to reductions provided in Paragraph 5.

Paragraph 5 of the Bond *specifically limits the obligation of the Bond to the amount required to fulfill the developer's contractual obligation under the Escrow Agreement.*

> 5. The Bond shall be called upon only to the extent and amount necessary to bring the Developer into compliance with the Escrow Agreement.

Lastly, Paragraph 8 of the Bond confirms that the only obligees (the only parties holding rights under the Bond), are the Escrow Agent and Division and that no other parties have rights under the Bond.

> No right of option [*sic*][action] shall accrue on this bond to or for the use of any person or corporation other than ESCROW AGENT or DIVISION.

**D. The operation of the Surety Bond with its incorporated provisions.**

The provisions of the Act, the Escrow Agreement, and the Bond, referencing the other, taken together, provide consistent, non-contradictory, requirements for escrows of deposits that operate as follows:

- All deposits paid by unit buyers must be escrowed as required under Section 718.202. Mona Lisa paid each buyer deposit into an appropriate escrow account as defined by Section 718.202.

- In accordance with subsection (1) of Section 718.202, the First 10% Deposits must be deposited into a separate escrow account and may not be released to the developer prior to closing unless the developer substitutes for the deposited funds Division-approved alternative assurances. In this case, Mona Lisa provided a Division-approved Surety Bond to substitute for the funds deposited into the First 10% Account.

- The only parties to the Bond were the Surety, Mona Lisa, the Escrow Agent and the Division. The Bond provided expressly that no one else had rights under the Bond; this included the Appellees.

- In accordance with subsections (2) and (3) of Section 718.202, deposits in excess of the first 10% must be placed into the Over 10% Account. These funds may be released to the developer only upon the developer's certification that the funds to be released will not be used for salaries, commissions or expenses of salespersons or for advertising. Mona Lisa submitted the appropriate certification to the Escrow Agent and the Escrow Agent released the funds on deposit in the Over 10% Account to Mona Lisa.

- Upon the funds' release from the Over 10% Account to Mona Lisa, the Escrow Agent had no obligation to see to the application of the those funds and neither the Escrow Agreement nor the statute conferred any right on the Escrow Agent to recover the released funds or imposed any obligation on Mona Lisa to return these released funds to escrow.

- In summary, the Bond substituted for the First 10% Deposits, which were then released from escrow pursuant to subsection (1) of Section 718.202. The Over 10% Deposits were released from escrow pursuant to subsections (2) and (3). Alternative Assurance had nothing to do with this escrow release. The obligations of the Bond run only to the Escrow Agent (or the Division), limited to the rights the Escrow Agreement provides concerning First 10% Deposits.

**E. The Purchase Agreements properly informed Appellees how their deposits would be used as required by Section 718.202.**

From September, 2005, through June, 2007, Appellees entered Purchase Agreements for Hotel Room Units ("Units") with Mona Lisa. SAC ¶¶ 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 30, 33, 36, 39, 42, 44, 47, 50, 53, 56, 58, 60, 62. *See also* SAC Exs. 1 through 23; *In re Mona Lisa*, 410 B.R. at 721-23; Haberman Dec. ¶ 9. The Purchase Agreements complied with the applicable provisions of the Act.

The Purchase Agreements state that each contract:

> and the respective rights and obligations of Purchaser and Seller hereunder shall be governed by those sections of Chapter 718 of the Florida Statutes that are applicable to condominium hotels and commercial condominium developments.

*See* Condominium Unit Purchase Agreement ("Purchase Agreement"), Appendix, Exhibit E, p. 2.

The Purchase Agreements further provide that all reservation deposits

> shall be paid to and held in an escrow account by Escrow Agent, in accordance with the provisions of the Escrow Agreement for Sales Deposits (the "Escrow Agreement") entered into between the Seller and the Escrow Agent.

App. Ex. E, Purchase Agreement at ¶ 7.

Significantly, the Purchase Agreements expressly state:

> By execution of this Contract, Purchaser agrees to be bound by the Escrow Agreement, a copy of which has been delivered to Purchaser contemporaneously with or prior to Purchaser's execution of this Contract.

*Id.*

Moreover, the Purchase Agreements further note, at paragraph 27(e), that

> the terms, provisions and agreements of this Contract shall be construed, enforced and governed by the laws of the State of Florida.

App. Ex. E, Purchase Agreement at ¶ 27(e).

Finally, in addition, the Purchase Agreement states that:

> Seller may withdraw any portion of the Deposits in excess of ten percent (10%) of the Purchase Price from a special account established by Escrow Agent in accordance with Section 718.202 of the *Florida Statutes*, after construction of the Condominium improvements has begun.

*Id.*; SAC Exs. 1 through 23 at ¶ 7. As evidenced by Exhibit 4 to the Prospectus, Appellees received a copy of the Escrow Agreement between Mona Lisa and SunTrust Bank. Haberman Dec. ¶ 8. Consistent with the requirements of Section 718.202, the Appellees did not receive a copy of the Bond. *Id.*

**F. Plaintiffs' claims against Mona Lisa and Westchester**

Mona Lisa filed for Chapter 11 bankruptcy protection on January 15, 2009. *In re Mona Lisa*, 472 B.R. at 596. Eventually, seventy-one buyers filed four separate adversary proceedings against Mona Lisa and Westchester. *In re Mona Lisa*, 472 B.R. at 596.

The parties then filed cross-motions for summary judgment. After extensive briefing, on May 16, 2012, the Bankruptcy Court denied nearly all of the Appellees' claims and dismissed twelve of the sixteen counts set forth in the Amended Complaint. *In re Mona Lisa*, 472 B.R. at 595, 662-663. However, the Bankruptcy Court did find in favor of the Appellees on Counts VII, VIII, XV, and XVI determining *inter alia* that Mona Lisa violated Section 718.202 of the Act when it deposited Over 10% Deposits released from the special escrow account into its operating account (used to receive and disburse the $50 million required for construction and development) and, based on the principle of money fungibility, necessarily used some of the Over 10% Deposits (then comingled with millions of dollars from other sources) for advertising purposes. *Id*. at 625.[4] Based on these violations of the Act, the Bankruptcy Court granted summary judgment to the Appellees, finding that plaintiffs were entitled to revoke their Purchase Agreements and a full refund of their deposits, together with interest, the payment of attorneys' fees and costs. *Id*. at 628.[5]

Relying on the first five lines of Paragraph 4 of the Bond, the Bankruptcy Court further found that Westchester's Bond applied to both the Appellees' First 10% Deposits and the Appellees' Over 10% Deposits. *Id.* Ignoring the other language of the Bond, including the operative provision, and failing to construe the Bond in conjunction with the Escrow Agreement,

---

[4] These rulings are not the subject of Westchester's appeal.

[5] The Bankruptcy Court also determined that Mona Lisa's violations of the Act constitute a breach of the Purchase Contracts and granted summary judgment to plaintiffs on their breach of contract claims.

the Purchase Agreement, the statutory scheme, as well as the object and purpose of the Bond and the intent of the parties thereto, the Bankruptcy Court held that Paragraph 4 of the Bond, read in apparent isolation, "clearly requires Westchester to pay *all of the deposits Mona Lisa is required to refund under Florida Statute Chapter 718 for a breach of the purchase contracts*." *In re Mona Lisa*, 472 B.R. at 645-46 (emphasis supplied).

As stated earlier, Westchester appeals seeking a determination that contrary to the Decision, Westchester's Bond is liable only to fund the Escrow Agent's return of the First 10% Deposits and is not liable for the deposits that had been previously and properly released to Mona Lisa from the "Over 10% Account."

## SUMMARY OF ARGUMENT

The Bankruptcy Court correctly stated the requirements of Section 718.202(1), (2) and (3) of the Act for the establishment of deposit escrow accounts, the First 10% Account, and the Over 10% Account, and the separate requirements for the release of funds from those two accounts. *In re Mona Lisa*, 472 B.R. at 620-621. But the Bankruptcy Court's first factual and legal error was to find that a "developer may withdraw and use the funds from the Under 10% Escrow *if it provides the* ***purchaser*** *with alternative assurance*, such as a Bond, in an amount equal to the Under 10% Escrow." *Id.* at 619. This is not correct. The developer does not provide the *purchaser* with alternative assurance – it provides the *Escrow Agent* and the *Division* with alternative assurance, in order to substitute a financial guarantee for the First 10% Deposits, and thus to allow the Escrow Agent to release the First 10% Deposits to the developer. Indeed, under the Act, the Appellees, as purchaser of the units, are not parties to the Bond and, in fact, the Bond expressly states they possess no rights under the Bond. *See* Bond, page 2, Paragraph 8.

The Bankruptcy Court then compounded its error in reasoning by creating a non-existent direct Bond liability to buyers for non-existent alternative assurance for the funds released from

the Over 10% Escrow account. Specifically, the Bankruptcy Court found that the "Bond and Westchester as Surety are liable to the Appellees *for all deposits due and payable* by Mona Lisa, *not just the funds deposited to the First 10% Account*, up to the Bond limit of $6,575,000." *In re Mona Lisa*, 472 B.R. at 645-646 (emphasis supplied).

In making these fundamental errors of fact and of law, the Bankruptcy Court failed to consider the Bond as a whole and ignored the writings incorporated into the Bond, i.e., the Act and the Escrow Agreement. The Bankruptcy Court failed to consider and give effect to the following: (1) The Bond itself states that it is alternative assurance for the First 10% Deposits. (2) The Act provides alternative assurance only under Subsection 718.202(1) for First 10% Deposits and contains no such provision for Over 10% Deposits. (3) Alternative assurance provides funding only for the Escrow Agent return of deposits pursuant to Escrow Agreement requirements. (4) The buyers have no rights under the Bond. (5) There is no provision in the Escrow Agreement for return of released Over 10% Deposits and thus, no basis for Escrow Agent rights or obligations with respect to released Over 10% Deposits. *See* Escrow Agreement, ¶ 5.4. (6) The Court found as a fact that the intent of the Bond was to provide a guarantee for the return of Appellees' First 10% Deposits. The Bankruptcy Court's Decision holding Westchester liable for the return of all deposits constitutes clear error and must be reversed.

## ARGUMENT

### A. The governing principles of contract interpretation under Florida law.

The Florida Supreme Court holds that a surety bond is a contract, and is therefore subject to the general law of contracts. *American Home Assur. Co. v. Larkin Gen'l Hosp., Ltd.*, 593 So.2d 195, 197 (Fla. 1992), citing *Crabtree v. Aetna Cas. & Sur. Co.*, 438 So.2d 102 (Fla. 1st DCA 1983). The intent of the parties to a surety bond, like any other contract, should govern its construction, and to determine the parties' intent:

> a court should consider the language in the contract, the subject matter of the contract, and the object and purpose of the contract. *Id.*, citing *Clark v. Clark*, 79 So.2d 426 (Fla. 1955). Surety bonds must be construed in harmony with their subject matter and purpose.

*Id.*, 593 So.2d at 198.

Florida courts have used the following long-established rules of construction to assist them in determining the intention of the parties:

> (1) the contract should be considered as a whole in determining the intention of the parties to the instrument;
>
> (2) the conditions and circumstances surrounding the parties to the instrument and the object or objects to be obtained when the contract was executed should be considered;
>
> (3) courts should place themselves, as near as possible, in the exact situation of the parties to the instrument, when executed, so as to determine the intention of the parties, objects to be accomplished, obligations created, time of performance, duration, consideration, mutuality and other essential features;
>
> (4) if clauses in a contract appear to be repugnant to each other, they must be given such an interpretation and construction as will reconcile them if possible; if one interpretation will lead to an absurd conclusion, then such interpretation should be abandoned and the one adopted which would accord with reason and probability; [and]
>
> (5) if the language of a contract is contradictory, obscure or ambiguous or where its meaning is doubtful so as to make it susceptible of two constructions, one of which makes it fair, customary, and such as a prudent man would naturally execute, while the other would make it inequitable, unnatural or such as a reasonable man would not be likely to enter into, then the courts will approve the reasonable, logical and [rational] interpretation.

*Huntington on the Green Condominium*, 874 So.2d 1, 4-5 (Fla. 5th DCA 2004), quoting *Triple E Development Co. v. Floridagold Citrus Corp.*, 51 So.2d 435, 438-39 (Fla. 1951); *Fla. Power Corp. v. City of Tallahassee*, 18 So.2d 671, 674 (Fla. 1944); *City of Tampa v. Ezell*, 902 So.2d

912 (Fla. 2d DCA 2005)(contract must be read as a whole and take into consideration what the parties sought to accomplish by entering into it).

Where a contract refers to and describes another writing, under Florida contract law, that "that other document, or so much of it as is referred to, is to be interpreted as part of the writing." *OBS Co. v. Pace Constr. Co.*, 558 So.2d 404, 406 (Fla. 1990); *Quix Snaxx, Inc. v. Sorensen*, 710 So.2d 152, 153 (Fla. 3d DCA 1998).

Similarly, Florida courts have long recognized that, generally,

> all existing applicable or relevant and valid statutes, ordinances, regulations, and settled law of the land at the time a contract is made become a part of it and must be read into it just as if an express provision to that effect were inserted therein, except where the contract discloses a contrary intention.

*Northbrook Property & Cas. Ins. Co. v. R&J Crane Service, Inc.*, 765 So.2d 836 (Fla. 4th DCA 2000), quoting 17A AM.JUR.2D *Contracts* § 381 (1999)(footnote omitted); *Grant v. State Farm Fire and Cas. Co.*, 638 So.2d 936 (Fla. 1994); *P.C. Lissenden Co. v. Bd. of County Comm'rs of Palm Beach*, 116 So.2d 632 (Fla. 1960); *Citizens Ins. Co. v. Barnes*, 124 So. 722 (Fla. 1929); *Westside EKG Assocs. v. Foundation Health*, 932 So.2d 214 (Fla. 4th DCA 2005).

Finally, in the event that clauses in a contract appear to conflict, it is a fundamental premise of Florida law that when that occurs "[the conflicting clauses] must be given such an interpretation and construction as will reconcile them if possible." *Huntington on the Green Condominium*, 874 So.2d 1, 4-5 (Fla. 5th DCA 2004), quoting *Triple E Development Co. v. Floridagold Citrus Corp.*, 51 So.2d 435, 438-39 (Fla. 1951).

**B. The Bankruptcy Court's own factual findings that the intent of the parties to the Bond was that it was to permit the release of the First 10% Deposits by substituting Westchester's contractual obligation to the Escrow Agent for the released funds contradict the Court's holding that the Bond is liable for the refund of the Over 10% Deposits.**

The fundamental task in the interpretation of a contract under Florida law is to determine the intentions of the parties. The parties here were the Escrow Agent, the Division and Westchester. In its Decision, the Bankruptcy Court correctly found that the purpose and intent of the parties to the Bond was that the Bond would substitute for the released First 10% Deposits.

On pages 620-621, the Court found:

> Because construction of the units was not completed when plaintiffs signed the purchase agreements, Mona Lisa was required to establish an escrow account for plaintiffs' deposits up to 10% of the purchase price. Mona Lisa did this, as evidenced by the Escrow Agreement. But Mona Lisa also purchased a surety bond as alternative assurance to allow it to withdraw 100% of the Under 10% Escrow deposits.

*In re Mona Lisa*, 472 B.R. at 620-621. Thereafter, the Court stated:

> . . . This interpretation is supported by the underlying purpose of the surety bond in § 718.202, which is to protect the first 10% of [appellees'] deposits from misuse.

*In re Mona Lisa*, 472 B.R. at 646.

Thus, the Bankruptcy Court's factual findings of the intentions of the parties to the Bond are sufficient in themselves to conclude that the Bond was intended to provide only for the return of the deposits that had been released from the First 10% Account.

**C. The Bond and the writings it incorporated limit the Surety's liability to the First 10% Deposits only.**

Florida law mandates that the Bond must be interpreted as a whole. *Huntington on the Green Condominium*, 874 So.2d 1, 4-5 (Fla. 5th DCA 2004), quoting *Triple E Development Co. v. Floridagold Citrus Corp.*, 51 So.2d 435, 438-39 (Fla. 1951). While the Bankruptcy Court adverted to other sections of the Bond, it relied solely on the first five lines of Paragraph 4 to

each its decision. The Court's error of interpretation becomes evident upon examination of each section of the Bond and then reading them together as a whole.

### 1. The Bond's first paragraph defines the Surety's obligation and the Bond has no meaning without that paragraph.

The first paragraph of the Bond contains its fundamental terms and is critical to its proper interpretation. The first paragraph provides, in pertinent part, as follows:

> KNOW ALL PERSONS by these presents that the PRINCIPAL [Mona Lisa] and the SURETY [Westchester] are held and firmly bound unto the Division of Florida Land Sales, Condominiums and Mobile Homes of the Department of Business and Professional Regulation, State of Florida (hereinafter "DIVISION") and/or unto SunTrust Bank (hereinafter "ESCROW AGENT") as obligees in the amount of Five Million Dollars ($5,000,000.00), lawful money of the United States of America **(said amount being a portion of the estimated total sum of the initial ten percent (10%) of deposits paid by purchasers to Developer pursuant to Purchase Agreements for the purchase of condominium units in *Mona Lisa at Celebration, a Condominium* in the State of Florida)** …

App. Ex. D, Bond, page 1 (emphasis added).

The Bond further provides:

> **WHEREAS**, the Director of the DIVISION has the discretion to accept other assurances in lieu of requiring the Developer to escrow such funds, including, but not limited to, a surety bond or an irrevocable letter of credit in an amount equal to the escrow requirement of Chapter 718, Florida Statutes.

App. Ex. D, Bond, page 2.

These first paragraphs of the Bond establish who the parties are. As is true in every surety bond, the Bond has two contractual obligors; the principal, Mona Lisa, and the Surety, Westchester. It then establishes who the obligees are, that is the obligation of the Bond is owed to the Escrow Agent and the Division.

Next these provisions state the dollar obligation ($5 million) and the subject of the dollar obligation, i.e., the "initial 10% of deposits paid by purchasers . . ." The Bond references the

statute, confirming that the subject matter of the Bond is the First 10% Deposits, since the statute provides for alternative assurance only in subsection (1) of section 718.202, which governs First 10% Deposits.[6] The paragraphs further confirm the subject matter of the Bond by reference to the obligees, SunTrust (or the Division in its stead), since the only deposits that SunTrust must always retain in cash or in the form of alternative assurance are the First 10% Deposits.

**2. The Bankruptcy Court failed to give effect to the remainder of the language of paragraph 4 of the Bond.**

While the first two paragraphs of the Bond plainly define its subject and coverage, the Bankruptcy Court found a conflict between those provisions and the language of Paragraph 4 of the Bond, that the Court concluded did not limit what deposits the Bond applied to. *In re Mona Lisa*, 472 B.R. at 646. Relying on *Johnson v. Johnson*, 725 So.2d 1209, 1212-13 (Fla. 3d DCA 1999), the Bankruptcy Court held that:

> [i]n Florida, operative clauses of a contract prevail over recital clauses and "whereas" clauses when a conflict arises between the two. Paragraph 4 of the surety agreement is an operative clause that clearly requires Westchester to pay all of the deposits Mona Lisa is required to refund under Florida Statute Chapter 718 for a breach of the purchase contracts. Westchester therefore is liable to plaintiffs for *all* deposits due and payable by Mona Lisa up to the surety bond limit of $6,575,000.

*In re Mona Lisa*, 472 B.R. at 646 (emphasis in original).

In finding a conflict between these provisions of the Bond, the Bankruptcy Court failed to follow the mandate of Florida law to read a contract as a whole and to find consistency among

---

[6] Westchester's Bond provides that

> [a]ll terms defined in Chapter 718, Florida Statutes, the Florida Condominium Act, the rules promulgated thereto, in any receipt, Contract, Agreement, or the Escrow Agreements shall have the same meaning when used in this bond.

*See* App. Ex. D, Bond ¶ 1.

provisions where consistency may fairly be found. Here, the first paragraph of the Bond, defining its scope, is entirely consistent with Paragraph 4.

But the Bankruptcy Court's error goes well beyond failing to read the Bond's first paragraph and paragraph 4 consistently. First, the Bankruptcy Court ignored the remaining provisions of Paragraph 4. These require Westchester to make such payments under the Bond "as a debt to ESCROW AGENT or DIVISION. . ." The provision that a payment under the Bond is a "debt to ESCROW AGENT or DIVISION" confirms that the Bond applies to the First 10% Deposits only, since the only debt to the Escrow Agent that could exist is a debt arising under the Escrow Agreement. While the developer remains liable at all times for the First 10% Deposits under the Bond, there is no other debt that could arise which could create an obligation under the Bond by the Surety to the Escrow Agent. In particular, no debt for the Over 10% Deposits could arise since once those deposits are released to the developer, there is no provision for the escrow agent to reclaim them. The Escrow Agreement confers no such right on the Escrow Agent and, no debt can arise with respect to those funds. *See* App. Ex. C, Escrow Agreement, ¶ 4. Accordingly, only payment by Westchester of the First 10% Deposits could ever qualify as "debts" to SunTrust.

When this additional language is given meaning, as required under the operative rules of construction, it becomes even clearer that the Bond's first paragraph does not conflict with the provisions of Paragraph 4 as a whole. The Bond's first paragraph defines the subject matter of the Bond as First 10% Deposits released to the developer. To the same effect, Paragraph 4 only requires Westchester to make payments only in satisfaction of "debts to Escrow Agent or Division . . ." Such a debt can only arise for First 10% Deposits. Finally, as we show below, the Bankruptcy Court also ignored the remaining provisions of Paragraph 4 which states that Paragraph 5 creates a limitation on the amount to be paid by the Surety of the Bond.

### 3. Paragraph 5 of the Bond specifically limits the Surety's obligation to the obligation set forth in the Escrow Agreement.

Paragraph 5 of the Bond states a specific limitation on the surety's liability providing that the Bond:

> shall be called upon only to the extent and amount necessary to bring the Developer into compliance with the Escrow Agreements.

In other words, the amount that can be drawn under the Bond is limited to the amount owed by the developer under the Escrow Agreement, i.e., the amounts that the Escrow Agent could recover from the developer under the terms of the Escrow Agreement.

Under the Act and the Escrow Agreement, the only deposits that a developer must assure are maintained in escrow are the First 10% Deposits. Those deposits must be maintained as cash or as alternative assurance provided by the developer. *See* Escrow Agreement ¶¶ 4 and 4.4. There is no requirement for the developer to maintain the "Over 10% Deposits" in escrow. To the contrary, pursuant to the Act and the Escrow Agreement, those deposits may be released to the developer upon the commencement of construction, without alternative assurance. *See* App. Ex. C, Escrow Agreement ¶5.4.

Upon release of the Over 10% Funds, the Escrow Agent is not responsible for the proper application of the released funds. *Id.* That responsibility rests with the developer, who agrees to hold the Escrow Agent harmless from any liabilities incurred by the Escrow Agent in connection with the disbursement of the Over 10% Deposits. *See* App. Ex. C, Escrow Agreement, ¶ 5.4; *In re Laketown Wharf Marketing Corp.*, 433 B.R. 401, 417 (Bankr. N.D. Fla. 2010)(where a purchase contract provides that the [Over 10%] deposit may be used in construction, a return of the [over 10%] deposit is limited to the funds that have not been used in construction; if the funds have been used, Fla. Stat. 718.202 does not mandate their return). Therefore, under no circumstances can the funds released from the Over 10% Account constitute a debt of the developer to the Escrow Agent or an obligation of the Escrow Agent to the buyers.

Without question, the Bond was obtained in accordance with the requirements of the Act with the intent of the parties to provide alternative assurance only for the First 10% Deposits only. *See* App. Ex. C, Escrow Agreement, ¶ 4; App. Ex. D, Bond, ¶ 1; App. Ex. B, Fla. Stat. § 718.202(1). The Bankruptcy Court found that intent as a matter of fact.

Beyond what Westchester asserts is the intent of the parties, the terms of the bond and its incorporated writings, determine the liability of the surety. A surety does not undertake to do more than that expressed in bond. *Crabtree v. Aetna Cas. and Sur. Co.,* 438 So. 2d 102, 105 (Fla. 1st DCA 1983). *When a bond is required by law, such bond must be construed in the light of such law and the purpose of said bond is to accomplish the objectives of the law. Westchester Fire Ins. Co. v. City of Brooksville*, 731 F. Supp. 2d 1298, 1305 (M.D. Fla. 2010), citing *Loveland v. Lazzara*, 219 So. 2d 74, 76 (Fla. 2d DCA 1969). Here, the provisions of the Act readily show that the purpose of the Bond was to provide alternative assurance for the release of only the First 10% Deposits. Fla. Stat. 718.202(1), (2), and (3). And as stated at length previously, the contractual structure of the Bond and the Escrow Agreement compel the conclusion that the Bond provides funding only for the return of the First 10% Deposits.

**D. Construction of the Bond's guarantee of Alternative Assurance as limited to the First 10% Deposits accords with the intent of the parties to the Escrow Agreement, the Legislative intent as set forth in the Act, and Appellees' Agreement to the scope of the Bond's guarantee.**

As we have described, the Act treats First 10% Deposits and Over 10% Deposits differently, mandating protection of the Fist 10% Deposits by the retention of a financial guarantee. The Act does not provide similar protection for the Over 10% Deposits. The separate treatment of the two types of deposits logically accords with the intent of the Florida legislature in crafting the Act. As one court recently found, "[t]he objective of the Florida Legislature has been to strike a balance between the interests of the individual unit buyers and owners, and those of the condominium developers and builders who represent a vital industry in the Florida."

*Double AA Int'l. Inv. Group, Inc., supra.*, 2010 WL 1258086 at *6. The separate treatment of First 10% Deposits and Over 10% Deposits reflects a legislative judgment consistent with this balance and bespeaks the legislative intent consistent with the intent of the parties in this case that the alternative assurance, the Bond, applies to the First 10% Deposits.

Finally, the Appellees were informed of, and agreed to, the conditions for the release of the two different types of escrow deposits, i.e., alternative assurance for release of the First 10% Deposits and commencement of construction for the release of the Over 10% Deposits. Under the statute and agreements, the Appellees had no involvement with, or even knowledge of the Bond, or its terms. The only party intent that governs is the intent of the parties to the Bond and that intent was that the Bond constituted alternative assurance for the First 10% Deposits and nothing else.

## CONCLUSION

Based on the foregoing, it is evident that the Bankruptcy Court erred when it determined that Westchester's Bond provided security for funds deposited to the "Over 10% Account." Reading the language of all of the relevant documents harmoniously in order to give effect to all provisions, it is clear that in this case, Section 718.202(1) of the Act, the Bond, and the Escrow Agreement provide that alternative assurance applies only to secure the release of funds from the "Under 10% Account." Consistent with the plain intent of the parties, the Bond provided no guarantee for the Over 10% Deposits.

For all these reasons, Appellant Westchester Fire Insurance Company respectfully requests that the Final Judgment entered be reversed and that summary judgment be entered in its favor.

Dated: October 18, 2012

Respectfully Submitted,

By: */s/ Raquel M. Fernandez*
Raquel M. Fernandez (FBN 0055069)
rfernandez@cozen.com
Cozen O'Connor
Southeast Financial Center, Suite 4410
200 South Biscayne Boulevard
Miami, Florida 33131-4332
Telephone: (305) 704-5940
Facsimile: (305) 704-5955

and

Robert McL. Boote
rboote@cozen.com
Cozen O'Connor
200 Four Falls Corporate Center, Suite 400
West Conshohocken, PA 19428
Telephone : (215) 665-4630
Facsimile: (610) 941-0711

*Attorneys for Appellant Westchester Fire Insurance Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of October, 2012, I electronically filed the foregoing Brief of Appellant Westchester Fire Insurance Company with the Clerk of Court using CM/ECF, and that the foregoing is being served on the following counsel of record through the CM/ECF system:

John L. Urban, Esq.
Urban Thier Federer & Jackson, P.A.,
200 S. Orange Ave., Suite 2025, |
Orlando, Florida 32801
urban@urbanthier.com
*Counsel for* Bruno *and* Dodsworth *Plaintiffs/Appellees*

Mark Rutecki, Esq.
Mark Rutecki & Associates, P.A.,
1420 Celebration Boulevard, Suite 200,
Celebration, Florida 34747
mark@rutecki.com
*Counsel for* McKibbin *Plaintiffs/Appellees*

Gregory W. Stoner, Esq.
The Property Rights Law Firm, P.A.,
121 S. Orange Ave., Suite 1470
Orlando, Florida 32801
gws@eminentdomainfirm.com
*Counsel for* Bennett *Plaintiffs/Appellees*

Richard B. Webber, II, Esq.
Zimmerman Kiser & Sutcliffe PA
315 East Robinson Street, Suite 600
Orlando, Florida 32801
*Counsel for Intervenor Plaintiffs/Appellees*

/s/ Raquel M. Fernandez
Raquel M. Fernandez